UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KIRSTEN BYRD,
*Plaintiff*,

v.

No. 3:24-cv-207 (VAB)

MIDDLETOWN BOARD OF EDUCATION,
ALBERTO VÁZQUEZ MATOS,
*Defendants.*

**RULING AND ORDER ON MOTION TO DISMISS**

Kirsten Byrd ("Plaintiff") has sued Middletown Board of Education ("Middletown Board" or "Board") and Dr. Alberto Vázquez Matos[1], Middletown Public Schools Superintendent, in his official and personal capacity, (collectively "Defendants") alleging violations of the First Amendment of the United States Constitution and Article First, Sections Four and Fourteen of the Connecticut Constitution under 42 U.S.C. § 1983 and Conn. Gen Stat. § 31-51q. Compl., ECF No. 1 (Feb. 15, 2024) ("Compl.").

Defendants have moved to dismiss Ms. Byrd's Complaint. Mot. To Dismiss, ECF No. 12 (April 15, 2024) ("Mot.").

For the following reasons, the motion to dismiss is **GRANTED**.

The Section 1983 claim is dismissed with prejudice.

The Conn. Gen. Stat. § 31-51q claim is dismissed without prejudice to refiling in state court.

---

[1] In her Complaint, Ms. Byrd spells Defendant's name "Alberto Vasquez-Matos." In his own filings, Defendant spells his name as "Alberto Vázquez Matos." The Court uses the Defendant's spelling for this Ruling and Order, and will update the Docket accordingly.

1

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

      A.  **Factual Allegations**

The Middletown Board of Education oversees Middletown Public Schools ("District"), a school district in Middletown, Connecticut. Compl. ¶ 7. Dr. Vázquez Matos has the responsibility of managing the district day-to-day, including discipline and placement of teachers. *Id.* ¶ 10.

Ms. Byrd began teaching health and physical education in Middletown Public Schools in 1997. *Id.* ¶ 11.

As part of her role, Ms. Byrd instructed eight graders on the District's "Cultural Diversity Curriculum" including "internet safety, self-esteem, romantic relationships, drug education, and career education." *Id.* ¶ 27.

The District had allegedly been using this curriculum for nearly ten years and had the curriculum posted on the District website. *Id.* ¶ 37.

When teaching the Cultural Diversity Curriculum, Mr. Byrd "typically introduced terms demonstrating derogatory, stereotypical, hostile, and discriminatory thinking and descriptions of different cultural groups" including "insulting language about African Americans, Hispanics, other ethnic groups, women, gays, lesbians, those of Italian and Polish descent, and those of different religions." *Id.* ¶ 41.

Ms. Byrd informed students in advance that discussions in class could make them feel uncomfortable and offered "emergency passes" allowing students to leave the room if they felt discomfort during the lesson. *Id.* ¶¶ 49, 54, 56.

On October 29, 2021, Ms. Byrd taught a lesson on cultural diversity that was allegedly part of the District curriculum. *Id.* ¶ 62.

During this lesson, Ms. Byrd gave a presentation on "discrimination based on national origin." *Id.* ¶ 64.

For this presentation, she provided the example of "using the word 'spic' and discuss[ed] its origin and common usage." *Id.* Then "[s]tudents added to the list of slurs about the different groups." *Id.* For example, students "added 'Porch Monkey' as a racial slur for African Americans, 'Transie' as a slur about sexual identity." *Id.*

Ms. Byrd then "went on to discuss and refer to the word 'nigger'[,] the specific full version of the 'N-word,'" including "asking [class participants] what that proper name meant to them and eliciting class discussion." *Id.* ¶ 65.

One African American student stated that she felt uncomfortable with Ms. Byrd's use of the full version of the n-word and turned her chair away from Ms. Byrd. *Id.* ¶ 66.

Another student allegedly said that Ms. Byrd has "no business" using the full n-word because she was white, and another student agreed. *Id.* ¶ 68. These students additionally said that they would prefer that this class was taught by a teacher of color. *Id.* ¶ 69.

A different student then asked Ms. Byrd if her husband was Black. *Id.* ¶ 70. She explained that he was, as was her father and children. *Id.* This student allegedly passed Ms. Byrd a note saying "n word pass" that Ms. Byrd understood as the student "giving her permission to use the word" because of her family. *Id.*

During this discussion, at least one student appeared to be videotaping the class. *Id.* ¶ 71–72.

Eventually, Ms. Byrd stopped the class, and sent everyone out of the room "for an extended mask break." *Id.* ¶ 73. She asked to speak to one of the students who was upset. *Id.* This student who declined. *Id.*

Ms. Byrd continued to teach the lesson in her next class period, allegedly without controversy. *Id.* ¶ 75.

At the end of the day, Ms. Byrd sought out the school administration to explain what had happened. *Id.* ¶¶ 77, 79. Ms. Byrd spoke to the vice principal of the school who allegedly affirmed her teaching of race and diversity and offered to come to class in the future. *Id.* ¶¶ 80–82. The principal also allegedly affirmed Ms. Byrd's teaching and said "he would support her as much as he could." *Id.* ¶ 86.

During their meeting, the principal called the Superintendent's office, and spoke to the Chief of School Operations and Communications, Marco Gaylord. *Id.* ¶ 88. Ms. Byrd explained to Mr. Gaylord what had happened. *Id.*

Mr. Gaylord requested a copy of Ms. Byrd's curriculum for that day, which Ms. Byrd sent. *Id.* ¶¶ 89–90.

The same day, posts appeared on social media that included recordings of the lesson taken by a student and "falsely stated that Ms. Byrd justified the use of the 'n-word' in the class because her husband and father were black." *Id.* ¶ 91.

Later that evening, the principal called Ms. Byrd and placed her on administrative leave—meaning she would continue to be paid but could not appear at the school. *Id.* ¶ 94.

Around one week later, the health curriculum was removed from the district website. *Id.* ¶ 98.

On November first and third of 2021, the District placed resources in Ms. Byrd's classroom that "by implication suggested that Ms. Byrd had acted improperly." *Id.* ¶ 99.

Ms. Byrd alleges that the Defendants were attempting to "cover up" that "her class discussion had been a regular part of the class curriculum" and instead "scapegoat[ed] Ms. Byrd

4

and suggest[ed] that she was not following the curriculum." *Id.* ¶ 97.

On November 10, 2021, Ms. Byrd received a letter from the District stating that she was on administrative leave and informing her that she was prohibited from "entering the Middle School or speaking with her colleagues and students." *Id.* ¶ 101.

On November 19, 2021, the District notified Ms. Byrd that they intended to terminate her employment. *Id.* ¶ 104.

In December of 2021, the District conducted a *Loudermill* hearing to review Ms. Byrd's conduct. *Id.* ¶ 105. Ms. Byrd remined on administrative leave while the District considered the appropriate discipline. *Id.* ¶ 106.

On June 9, 2022, the District informed Ms. Byrd that she would no longer be able to teach physical education at any secondary school in the district *Id.* ¶ 107. But, the District stated it would not terminate her employment if she accepted a job teaching health and physical education in the alternative education program starting in August of 2022. *Id*. The District offered Ms. Byrd the immediate position of tutoring students who had been expelled. *Id.*

Ms. Byrd accepted the new positions "[u]nder threat of termination." *Id.* ¶ 109.

On July 18, 2022, the District informed Ms. Byrd that she would not teach at the alternative education program in August of 2022. *Id.* ¶ 111. Instead, the District placed Ms. Byrd in physical education in an elementary school. *Id.* ¶ 112. In this position, she would not be permitted to teach health, diversity, or other academic topics. *Id.* ¶ 114.

On November 11, 2022, Ms. Byrd requested leave under the Family and Medical Leave Act due to mental stress, anguish, depression, and anxiety related to the October 29, 2021 incident. *Id.* ¶¶ 118–20. She has not returned to work. *Id.* ¶ 123.

### B. Procedural History

On February 15, 2024, Ms. Byrd filed her Complaint. *Id.*

On April 15, 2024, Defendants filed a motion to dismiss and an accompanying memorandum of law in support of their motion. Memo. in Support, ECF No. 12-1 (April 15, 2024) ("Memo. in Support").

On June 18, 2024, Ms. Byrd filed an objection to the motion to dismiss. Objection re Motion to Dismiss, ECF No. 20 (June 18, 2024) ("Obj.").

On July 8, 2024, Defendants filed a reply to the objection to the motion to dismiss. Reply to Response to Motion to Dismiss, ECF No. 21 (July 8, 2024) ("Reply").

## II. STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records*

*LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

**III.   DISCUSSION**

Ms. Byrd alleges that the Middletown Board is liable under Conn. Gen. Statute § 31-51q for restricting speech that is protected by the First Amendment of the United States Constitution and Article First, Sections Four and Fourteen of the Connecticut Constitution ("Count I"). Compl. ¶ 126–36. Ms. Byrd also alleges that Dr. Vázquez Matos is liable under Section 1983 for restricting speech that is protected under the First Amendedment ("Count II").

Defendants argue that Plaintiff failed to sufficiently allege violations of the United States and Connecticut constitutions, and that Dr. Vázquez Matos has immunity from liability under the qualified immunity doctrine.

The Court will address each argument in turn, beginning with the federal claims.

### A. The Section 1983 Claim

Section 1983 provides a cause of action for damages against any state official acting under color of state law who violates the Constitution or laws of the United States. *See* 42 U.S.C. § 1983. Qualified immunity, however, can shield "employees from civil liability under §1983 if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." *Cornejo v. Bell*, 592 F. 3d 121, 128 (2d Cir. 2010) (internal quotation marks omitted); *see also Luna v. Pico*, 356 F.3d 481, 490 (2d. Cir. 2004) ("The doctrine of qualified immunity protects state officials from civil liability for actions performed in the course of their duties if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

Ms. Byrd argues that Dr. Vázquez Matos violated the First Amendment by firing her in response to speech she "made about a legitimate controversial topic" while teaching the District curriculum. Obj. at 18. Ms. Byrd also argues that there are factual issues related to Dr. Vázquez Matos's motives and that a jury could determine that his behavior was not "objectively reasonable." Obj. at 31.

Defendants argue that because there is an "open question" as to the standard that applies to such speech, there is no "clearly established right," and qualified immunity is warranted for Dr. Vázquez Matos. Memo. in Support at 10 n.3.

8

The Court agrees.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). "To determine whether a right is clearly established, we look to (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fisher*, 616 F. 3d 100, 105 (2d Cir. 2010).

The alleged First Amendment right in this case is not clearly established. The Second Circuit has applied three different standards to speech made by educators in different contexts, and has no holdings determining what rule applies to the type of speech at issue here.

In *Weintraub v. Board of Education*, the Second Circuit applied the test articulated in the Supreme Court decision *Garcetti v. Ceballos*, 547 U.S. 410 (2006), to speech made by a fifth-grade teacher to school officials outside of the classroom. 93 F.3d 196 (2d Cir. 2010). The *Garcetti* framework, which is applied to most public employee speech, does not protect speech by public employees made "pursuant to their official duties, [because] the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

In *Heim v. Daniel*, the Second Circuit held that the *Garcetti* framework does not apply to a university professor's academic speech. 81 F.4th 212, 228 (2d Cir. 2023). Instead, the Second Circuit relied on the test articulated in *Pickering v. Board of Education*, 391 U.S. 563 (1968). This rule requires courts to "ask (1) whether the employee is speaking on a matter of 'public

concern,' and if so (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer'" *Heim*, 81 F.4th at 228 (citing *Matthews v. City of New York*, 779 F.3d 167, 172–73 (2d Cir. 2015)).

Finally, in *Silano v. Sag Harbor Union Free School District*, the Second Circuit relied on Supreme Court's analysis in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) to assess whether the speech made by a guest teacher in a public high school was protected under the First Amendment. 42 F.3d 719, 723 (2d. Cir. 1994). Under the *Hazelwood* test, "school-sponsored . . . expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" can be regulated for a "legitimate pedagogical purpose." *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 281, 289 (1988).

Yet, the Second Circuit has not decided whether any of these tests clearly apply when a primary or secondary school teacher is speaking allegedly pursuant to a district's curriculum. *See, e.g.*, *Heim*, 81 F.4th at 228 n. 13 (noting that the Second Circuit "express[ed] no view as to how or whether *Garcetti* might apply to, say, an elementary school teacher's speech."); *Lee-Walker* v. *New York City Dept. of Educ.*, 712 Fed. Appx. 43, 44 (2d Cir. 2017) (stating that "neither *Garcetti* nor *Hazelwood* clearly govern[ed]" a case involving a teacher's classroom discussion on the Central Park Five); *Panse v. Eastwood*, 303 Fed. Appx. 933, 934 (2008) (noting that it is "an open question . . .whether *Garcetti* applies to classroom instruction").

Indeed, Ms. Byrd acknowledges that "there ha[s] never been a case in the Second Circuit or in the District Court that ha[s] held that *Garcetti* applied in the secondary school setting." Obj. at 30. And, this is the exact reason that the law is not clearly established: the Second Circuit has no holdings on whether *Garcetti* or any other standard applies to classroom speech in a

secondary or primary school setting. There is no "existing precedent [that has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

As to her "objectively reasonable" analysis argument, when the law is not clearly established—as is the case here—this analysis "becomes moot." *Rohman v. NYCTA*, 215 F.3d 208, 216 n.4 (2d. Cir. 2000); *see also Walczyk v. Rio*, 496 F.3d 139, 154 ("Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." (citation omitted)). While the objective reasonableness of an action involves a factual analysis, the analysis as to whether the law is clearly established is a legal one. *See Mitchell v. Forsyth*, 472 U.S. 511, 529 (1985) ("[T]he purely legal question on which [defendant's] claim of immunity turns is . . . whether [the law] was clearly established[.]").

Here, qualified immunity is warranted because "[n]o decision before [October 2021] (and none since) would put 'every reasonable official' on notice that the conduct alleged violates a teacher's First Amendment rights." *Lee-Walker v. N.Y.C. Dep't of Educ.*, 220 F. Supp. 3d 484, 495 (S.D.N.Y. 2016), *aff'd,* 712 Fed. Appx. 43 (2d. Cir. 2017).

Accordingly, the Section 1983 claims against Dr. Vázquez Matos, will be dismissed.

### B. The Conn. Gen. Stat. § 31-51q Claim

"A district court's decision whether to exercise [supplemental] jurisdiction [over a state law claim] after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Technology, Inc., v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a

claim under subsection (a) if . . . the district court has dismissed all claims over which it had original jurisdiction[.]").

Having decided that her Section 1983 claims should be dismissed, there is no reason for this Court to retain jurisdiction over the Conn. Gen. Stat. §31-51q claim more suitably addressed in a Connecticut state court. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *see, e.g.*, *Traylor v. Hammond*, 94 F. Supp. 3d 203, 224 (D. Conn. 2015) (declining to exercise supplemental jurisdiction when "[a]ll of federal claims in the Amended Complaint ha[d] been dismissed"); *Zuro v. Town of Darien,* 432 F. Supp. 3d 118, 130 (D. Conn. 2020) ("Here, because all of the federal claims have been dismissed early in the action, I decline to exercise supplemental jurisdiction over the remaining state law claims.").

This case contains a novel area of state law—how and if an undecided area of First Amendment law should apply to a Section 31-51q claim—that Connecticut's courts are better equipped to address. *See Kroshnyi v. U.S. Pack Courier Servs. Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) ("A court may decline to exercise supplement jurisdiction, however, if, among other factors, the claim raises a novel or complex issue of State law." (internal quotation marks omitted)).

Accordingly, Ms. Byrd's Conn. Gen. Stat. § 31-51q claim will be dismissed. [2]

---

[2] Section 31-51q creates a cause of action against public and private employers who "subject any employee to discipline or discharge" when the employee has exercised "rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of [Connecticut]." Conn. Gen. Stat. § 31-51q(b). In a "'special and small category' of cases," federal courts have "arising under" jurisdiction over claims that find their "origins in state rather than federal law." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)). "[F]ederal jurisdiction over a state law claim

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED.**

The Section 1983 claim is dismissed with prejudice.

The Conn. Gen. Stat. § 31-51q claim is dismissed without prejudice to refiling in state court.

**SO ORDERED** at New Haven, Connecticut, this 22nd day of November, 2024.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.*

Here, deciding the federal issue would disrupt the "balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314 (2005). Because the Connecticut statute allows for suits against private employers, the application of federal constitutional principles in the context of the statute may differ from federal constitutional principles generally applied in federal court. *See, e.g.*, *Shumann v. Dianon Systems, Inc.*, 43 A. 3d 111 (Conn. 2012) (deciding how and if to apply *Garcetti* to Section 31-51q claims given the allowance of suits against private employers). It is not clear how an undecided area of First Amendment law should be applied in the context of this specific statute, and this Court's deciding of that question would impinge on the Connecticut judiciary's authority to do so. *See New York ex rel. Jacobson v. Wells Fargo Nat'l Bank*, 824 F.3d 308, 316 (stating that "a special state interest" weighs against a finding of original "arising under" jurisdiction). Accordingly, there is no original arising under jurisdiction over this claim.